IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL C., | ) | |
| | ) | |
|       Plaintiff, | ) | No. 19-CV-002173 |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW SAUL, | ) | Honorable Jeffrey Cummings |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
|       Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant, Michael C.[2] ("Claimant") brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security (the "Commissioner") that denied his claim for Disability Insurance Benefits ("DIBs") and Supplemental Security Income under 42 U.S.C. §§ 416(i) and 423(d) of the Social Security Act (the "Act"). The Commissioner has brought a cross-motion for summary judgment seeking to uphold its decision to deny benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, Claimant's motion for summary judgment [13] is granted and the Commissioner's motion for summary judgment [20] is denied.

---

[1] Andrew Saul is now the Commissioner of Social Security and is substituted in this matter pursuant to Fed. R. Civ. P. 25(d).

[2] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to Michael C. as Claimant.

1

I.  **BACKGROUND**

A.  **Procedural History**

On September 9, 2015, Claimant filed a DIBs application pursuant to Title II and Title XVI alleging a disability onset date of December 26, 2014. (Record ("R.") 201, 208). His claim was denied initially on December 30, 2015 and upon reconsideration on July 13, 2016. (R. 104, 128, 135). On April 18, 2018, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. (R. 10-20). The Appeals Council denied review on January 23, 2019, making the ALJ's decision the Commissioner's final decision. (R. 1-3). *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action.

B.  **Medical Evidence**

1.  **Evidence from the Medical Records**

Claimant suffers from anxiety, dysthymic disorder, insomnia, chronic pain, pain in right knee, post-traumatic stress disorder ("PTSD"), and cervical and lumbar spondylosis without myelopathy or radiculopathy. (R. 434).

Claimant was involved in a severe motor vehicle accident in 2003 and suffered serious injuries to his spine requiring surgery. (R. 376). Claimant has been suffering from chronic pain ever since and treated with "Dr. Miller in Elmwood [P]ark." (R. 376). On November 17, 2015, Claimant reported feeling "depressed and [having] [n]o energy," Dr. David Demorest assessed Claimant as suffering from depression, chronic pain and poor sleep. (R. 384-85). Dr. Demorest further opined that Claimant's "life has been completely altered as a result of the MVA [motor vehicle accident], not unusual." (R. 385). Dr. Demorest treated Claimant on a monthly basis between July 13, 2015 and October 30, 2017. (R. 376-434).

The record also reveals that Claimant suffered four falls. On February 11, 2015, Claimant was seen at the emergency room of Advocate Lutheran General Hospital, where he reported tripping over his girlfriend's dog and falling down some stairs, and complained of "[h]and pain-swelling" and a left hand injury. (R. 339, 334). After examination and x-rays, Claimant was diagnosed with a "[l]eft scaphoid fracture," and his left wrist was placed in a splint. (R. 339, 345-47). During his visit with Dr. Demorest on August 4, 2016, Claimant reported falling down some stairs a couple weeks prior that resulted in significant right knee pain. (R. 404-05). He was diagnosed with a sprain or strain of the right knee and x-rays were ordered. (*Id.*). On August 31, 2016, Dr. Demorest reviewed the x-rays and diagnosed Claimant with a "fracture of navicular (scaphoid) bone of right wrist" and pain in his right hand. (R. 407). At his visit with Dr. Demorest on March 7, 2017, Claimant reported falling down some stairs about 10 days prior and going to Lutheran General Hospital where they did x-rays of his wrist. (R. 418). Dr. Demorest noted that the x-rays showed a "[n]ew non-displaced navicular fracture," and he diagnosed Claimant with a left wrist fracture with instructions to consult an orthopedic surgeon. (R. 420-21). On August 9, 2017, Claimant saw Dr. Demorest and complained of left shoulder pain after falling a week prior. (R. 428). After physical examination and review of x-rays, Dr. Demorest diagnosed Claimant with a "[c]ontusion of left shoulder." (R. 429).

In addition to his monthly progress notes, Dr. Demorest completed a physical residual function capacity assessment on December 8, 2017. (R. 465-68). He opined that Claimant suffers from an equilibrium problem and until it is diagnosed and treated, will result in Claimant continuing to lose his balance and fall. (R. 465). Dr. Demorest reported that Claimant suffers from depression, anxiety and PTSD. (*Id.*). Dr. Demorest further opined that Claimant experiences severe pain and stress that affects his ability to pay attention and concentrate. (*Id.*).

He explained that Claimant has significant restrictions walking, balancing, bending, stooping and crouching. (R. 466). According to Dr. Demorest, Claimant: (1) can only sit and stand for 15 minutes at a time; (2) can walk only 20 minutes at one time; (3) can sit, stand and walk for a total of only two hours; (4) would need to lie down or recline for approximately four hours each workday; and (5) would require additional breaks lasting 20 to 60 minutes. (R. 466-67). Dr. Demorest opined that Claimant can only use his right hand two percent of the time and cannot use his left hand to perform reaching, handling and fingering. (R. 467). Dr. Demorest reported that Claimant is "very depressed," would be off-task more than 30 percent of the workday and would be absent five or more days a month. (R. 468). Lastly, he opined that the constant severe pain and stress would make it very difficult for Claimant to work successfully. (*Id.*).

### 2. Evidence from Agency Consultants

On December 8, 2015, Claimant was examined by Dr. Laron Phillips. (R. 358-62). Dr. Phillips diagnosed Claimant with PTSD, moderate major depressive disorder, panic disorder (without agoraphobia), and chronic pain resulting from injuries suffered from a motor vehicle accident about 12 years prior. (R. 361-62, 358). These conditions have caused Claimant to suffer "moderate impairments in social and interpersonal functioning." (R. 361). Dr. Phillips noted that Claimant's treating physician (Dr. Demorest) "is currently managing his depressive and anxiety symptoms" with prescription medication (Celexa and Xanax). (R. 359). Additionally, Dr. Phillips opined that Claimant's "primary occupational impairment is related to his physical health issues, subsequent to his motor vehicle accident" and that Claimant's psychiatric symptoms do not appear to significantly impair his occupational functioning. (R. 361).

On December 8, 2015, Claimant was also examined by Dr. Jorge Aliaga. (R. 366-371). Dr. Aliaga explained that he reviewed the February 11, 2015 x-rays of Claimant's left wrist and

4

the accompanying E.R. report, as well as Dr. Demorest's October 13, 2015 treatment notes. (R. 366). Dr. Aliaga assessed Claimant as having a depressed mood, being able to turn his head without eliciting any vertigo, having no knee deformity, having decreased range of motion in both knees, capable of walking 50 feet without any device, and having full grip strength in both hands. (R. 367-69). He opined that Claimant has a "[h]istory of injury to the cervical and lumbar spine," without any signs of radiculopathy. (R. 369). Dr. Aliaga, however, noted that there is a possibility that Claimant may develop "posttraumatic spondylolisthesis or arthritis of the spine." (R. 370). He further diagnosed Claimant with chronic knee pain and "degenerative osteoarthritis of the knees," right shoulder pain, and anxiety. (R. 370).

On December 22, 2015, non-examining expert Donald Henson, PhD determined that Claimant's impairments did not "significantly limit [his] physical or mental ability to do basic work activities. (R. 102-03). On December 24, 2015, non-examining expert Dr. James Madison issued a report finding that Claimant's "impairments are considered to be non-severe because they are not expected to cause more than a minimal limitation" in his ability to perform substantial gainful activity. (R. 92).

### C. Evidence from Claimant's Testimony

Claimant and his attorney appeared at the November 13, 2017 administrative hearing. In her opening statement, Claimant's attorney explained that Claimant was involved in a 2003 motor vehicle accident and he suffered fractures to his cervical, thoracic and lumbar spine and underwent surgery as a consequence. (R. 39). She further elaborated, that although he underwent surgery, Claimant has "never recovered from" his injuries and "continues to this day to have cervical and lumbar spondylosis, anxiety disorder, PTSD, chronic insomnia, [and] dysthymia disorder." (R. 39). Additionally, the attorney explained that Claimant "has equilibrium problems

5

and chronic falls." (R. 39). The ALJ questioned why the records contained no explanation for why Claimant was falling. (R. 41). The ALJ then inquired if Claimant had seen an "EMT or a neurologist for this equilibrium problem." (R. 41). His attorney explained that due to losing insurance coverage, Claimant has not been able to seek specialized treatment. (R. 41). In response to the ALJ's inquiry, Claimant explained that his "balance will go off or [he] will go into a state of vertigo, and [he] will get dizzy and usually that causes [him] to fall." (R. 41).

Claimant testified as follows on direct examination. He believes his main medical issue is his "dizzy spells and falling." (R. 42). He suffers from pain all over his body, and then identified the various fractures he suffered from recent falls as creating "extreme amounts of pain." (R. 42-3). He has constant intense neck and spine pain that he has experienced since the 2003 accident and the pain affects his ability to sleep through the night. (*Id.*). He also has "really bad anxiety" that negatively affects his mood and interferes with his ability to focus and concentrate. (R. 45-7). He takes prescription medication to help relieve the pain, and it only helps somewhat and causes him to feel groggy. (R. 47). Due to the worsening arthritis in his hands, he drops things often, and his wife has to dress him and cut his meat for him. (R. 50-1). Due to experiencing traumatic events, he suffers panic attacks approximately "three times a day." (R. 52). He explained that remembering these traumatic events causes him to become "really depressed and [unable to] control [his] emotions." (R. 53). Additionally, he has to alternate between sitting and standing every 15 to 20 minutes. (R. 54). He discussed his knee pain and difficulty kneeling and climbing stairs and explained that he and his wife had to relocate to a home without stairs due to his frequent falls. (R. 55). Lastly, Claimant stressed how anxious he was about falling again because he is "afraid [he is] going to break [his] neck." (R. 56).

At the conclusion of Claimant's testimony, the ALJ inquired into the lack of diagnostics showing any impairment in Claimant's knees, and inquired as to why he had not treated with an orthopedist for his knees or wrists. (R. 58-9). Claimant explained that he was not able to seek out such specialized treatment due to his lack of finances. (R. 59). The ALJ also inquired as to how Claimant was able to work full-time following the MVA but is unable to do so now, and Claimant explained that he is getting older and is "having a downward spiral." (R. 66). Claimant also explained that he was fired from his last job because he was not able to perform the necessary responsibilities of the job. (R. 66).

### D. Vocational Expert's Testimony

The vocational expert ("VE") asked Claimant a series of questions about his past work history prior to testifying about what type of jobs existed in the national economy that could be performed by a person with Claimant's residual functional capacity ("RFC"). (R. 75-9). The VE inquired into Claimant's most recent job as a maintenance person for a cell phone tower office and determined that such a job would be coded as janitor and is listed as medium, but it was performed as light because Claimant stated he only swept the floors. (R. 79). After the ALJ explained the hypothetical person, the VE testified that sufficient jobs existed at the light exertional level (e.g., cleaner, housekeeping, mail clerk and inspector). (R. 80). The VE further testified that sufficient jobs also existed at the sedentary level (e.g., inspector, surveillance system monitor, and semi-conductor bonder). (R. 80-1). When asked if the person "can only occasionally use the hands for gross and fine manipulation," the VE reported that such a person would be incapable of performing any jobs at the light or sedentary level. (R. 81). Additionally, the VE testified that if the individual had to take extra breaks during the workday beyond that of two 15-minute breaks and a half-hour to hour lunch break, there would be no work available in

the national economy. (R. 82, 84). The same would be said if that person was off-task more than 15 percent of the workday. (*Id.*). If that individual needed to alternate between sitting and standing, then "[t]here would be a 50 percent erosion" in the amount of jobs available. (R. 83).

## II. LEGAL ANALYSIS

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520(a). The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's RFC, which defines his or her exertional and non-exertional capacity to perform work. The SSA then determines at step four whether the claimant is able to engage in any of his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he or she is not disabled. *Id.* If the claimant cannot undertake his or her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of his or her RFC, age, education, and work experience. Under this standard, an individual is not disabled if he or she can perform work that is available. 20 C.F.R. § 404.1520(a)(4)(v).

**B. The ALJ's Decision**

On April 18, 2018, the ALJ issued a decision finding Claimant not disabled. (R. 20). Applying the five-step sequential evaluation that governs disability cases, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since his alleged onset date of December 26, 2014. His severe impairments at Step 2 were chronic pain syndrome, arthritis, degenerative disc and joint disease, and anxiety. (R. 13). The ALJ determined at Step 3 that none of Claimant's impairments met or medically equaled a listed impairment — either singly or in combination with one another.

Prior to moving to Step 4, the ALJ determined that the record did not fully support Claimant's statements regarding the restrictions imposed by his symptoms. (R. 15). The ALJ further found that Claimant had the RFC to perform light work as that exertional level is defined in 20 C.F.R. § 404.1567(b). The ALJ, however, added the following restrictions:

> no climbing of ladders, ropes, or scaffolds; no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling; no more than frequent overhead reaching bilaterally; no more than frequent use of the bilateral upper extremities for gross and fine manipulation (handling and fingering); must avoid all hazards such as unprotected heights and moving dangerous machinery; can learn, understand, remember, and carry

9

>out simple instructions; no more than occasional work with coworkers or general public and can sustain the work activities in 2 hour increments throughout the typical workday.

(R. 15). Based on these conclusions, the ALJ determined at Step 4 that Claimant could not perform any of his past relevant work. (R. 18). At Step 5, the ALJ determined that a sufficient number of jobs existed in the national economy that a person with Claimant's RFC could perform. (R. 19).

### C. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

### III. DISCUSSION

Claimant argues that the Commissioner's decision should be reversed and remanded for several reasons including because the ALJ improperly discounted Claimant's treating physician's opinion and wrongly determined Claimant's RFC. (Dckt. #14, at 6). Although the Commissioner vehemently disputes Claimant's arguments on these points, the Court agrees with Claimant and finds that his case must be remanded for these two reasons, each of which would warrant remand in its own right.

### A. The ALJ Erred By Discounting Claimant's Treating Physician's Opinion Without Discussing The Pertinent Regulatory Factors

A treating physician's opinion that "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is consistent with other substantial evidence contained in the record is entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); *Meuser v. Colvin,* 838 F.3d 905, 912 (7th Cir. 2016). If the ALJ decides not to assign controlling weight to the treating physician's opinion, then she must explain why by addressing the factors outlined in 20 C.F.R. § 404.1527(c)(2) for claims – like the one at issue here – that were filed prior to March 27, 2017. *Kaminski v. Berryhill*, 894 F.3d 870, 874 n.1 (7th Cir. 2018). The purpose of the regulatory factors is to guide the ALJ's reasoning when deciding what amount of weight to assign to the treating physician's opinion. *See Scrogham*, 765 F.3d at 698 (noting that when an ALJ fails to discuss the regulatory factors, a reviewing court "cannot assess whether she appropriately" determined how much weight to assign). As the Seventh Circuit has made clear – and the Commissioner acknowledges (Dckt. #21, at 8) – ALJs "must consider" these factors (namely, "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the

11

physician's opinion") when discounting a treating physician's opinion. *Larson v. Astrue*, 615 F.3d 744, 750–51 (7th Cir. 2010) (citing cases).

Even though the ALJ determined that Dr. Demorest's opinion was entitled to "little weight," she did not consider the above regulatory factors.[3] (R. 18). Had the ALJ done so, it is possible that she might have reached a different conclusion about Dr. Demorest. *See Meuser*, 838 F.3d at 912 ("The ALJ did not mention any 'regulatory factors' when evaluating Dr. Rhoton's opinion; the ALJ said only that the opinion merited 'little weight.' Looking at the factors, this conclusion is not supportable."). The record shows that Dr. Demorest treated Claimant on a monthly basis for twenty-seven months from mid-2015 through the fall of 2017. (R. 376-435). The record further shows that Dr. Demorest prepared dozens of pages of detailed progress notes documenting the nature and extent of the treatment that he provided to Claimant. (*Id.*). The Seventh Circuit has repeatedly held that the failure to address the regulatory factors when discounting a treating physician's opinion is reversible error requiring remand. *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014); *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011); *Campbell v. Astrue,* 627 F.3d 299, 308-09 (7th Cir. 2010); *see also Cullinan v. Berryhill,* 878 F.3d 598, 605 (7th Cir. 2017) ("An inadequate evaluation of a treating physician's opinion requires remand"). Remand is warranted here for the same reason.

### B. The ALJ's Flawed RFC Assessment Requires Remand

While the task of assessing a claimant's RFC is reserved to the Commissioner and not a medical expert, an ALJ must utilize "all of the relevant medical and other evidence" in the record to assess a claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The Seventh Circuit has held that an "RFC assessment must include a narrative

---

[3] Although the Commissioner vigorously defends the ALJ's decision to discount Dr. Demorest's opinions, he does not explicitly argue that the ALJ considered the above regulatory factors

discussion describing how the evidence supports each conclusion, citing specific medical facts." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); *see also* SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996) (stating that an "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific facts [] and nonmedical evidence [].").

Furthermore, an ALJ "must also explain how any material inconsistencies or ambiguities in the evidence [] were considered and resolved," SSR 96-8P, 1996 WL 374184, at *7, and the Seventh Circuit has made it clear that cherry-picking through the evidence contained in the record and ignoring evidence that proves disability is reversible error. *Briscoe ex rel. Taylor*, 425 F.3d at 352; *Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."); *Scrogham*. 765 F.3d at 698-99 (finding that the ALJ improperly only selected evidence in the record "that supported her conclusion that Mr. Scrogham was not disabled" and ignored contradictory evidence.); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

The ALJ's RFC assessment fails to adhere to the above standards and requires that this case be remanded for a proper determination for the following reasons.

**1. The ALJ Erred By Overlooking Evidence That Supports The Restrictions That Claimant's Treating Physician Imposed On Claimant's Ability To Function**

The ramifications of the ALJ's failure to properly discuss the regulatory factors when determining what weight to assign to Dr. Demorest's opinion spilled over into her assessment of Claimant's RFC. *Lillquist v. Astrue,* No. 12 C 10206, 2015 WL 1396739, at *7 (N.D.Ill. Mar. 25, 2015) (holding that "[t]he ALJ erred in that the RFC determination was not supported by

13

substantial evidence because the ALJ unjustifiably discounted [the treating physician's] opinion"). In particular, the ALJ assigned "little weight" to Dr. Demorest's physical residual functional capacity assessment, which determined, in part, that Claimant would:

> never be[] able to use his left hand for any activity and never be[] able to use his right hand for more than two percent of the workday; never be[] able to lift more than five pounds at a time; and not be[] able to sit more than 15 minutes at one time.

(R. 18). The ALJ discounted Dr. Demorest's opinion because she determined that "there is *no* evidence justifying any of these major restrictions." (R. 18) (emphasis added).

The record, however, does contain evidence that supports Dr. Demorest's opinion regarding Claimant's restrictions. To begin, Claimant testified that due to the worsening arthritis in his hands he drops things often and his wife has to dress him and cut his meat. (R. 50-1, 66, 72-3). Claimant's testimony is consistent with Dr. Demorest's opinion that he has limited ability to use his hands, and the ALJ was not at liberty to simply disregard this testimony without comment. *See Meuser,* 838 F.3d at 913 (holding that "[a]n ALJ cannot disregard a claimant's limitations in performing daily activities") (internal quotation marks omitted). The diagnostics showing that Claimant suffered two fractures of bones in his left wrist and an additional fracture of a bone in his right wrist between 2015 and 2017 provides further foundational support for Dr. Demorest' opinion concerning Claimant's hands. (R. 404-07, 418-21, 428-29).

Furthermore, Claimant testified that he has to alternate between sitting and standing every 15 to 20 minutes (R. 54), which is consistent with Dr. Demorest's opinion that he would require a position in which he can alternate between sitting and standing. (R. 466). In addition, contrary to the ALJ's statement that there was no evidence that Claimant made complaints related to sitting (R. 18), Claimant did report on March 21, 2016 that "he cannot walk or sit for periods of time without feeling a lot of pain and uncomfortability." (R. 269). Finally, Claimant

reported – also on March 21, 2016 – that he had an "inability to lift more than 5-10 lbs.," and this supports Dr. Demorest's lifting restriction. (R. 269).[4] This evidence supports a finding of disability and the ALJ should address it on remand. *Briscoe ex rel. Taylor*, 425 F.3d at 354; *see Zurawski*, 245 F.3d at 888 (flatly dismissing highly corroborative evidence is reversible error); *Dukleska v. Colvin*, No. 2:14-CV-430 JD, 2016 WL 814845, at *5–6 (N.D. Ind. Mar. 1, 2016).

### 2. The ALJ Erred By Failing To Consider Evidence That Claimant Has A Distractible Thought Process When Formulating Claimant's RFC

The ALJ found that Claimant's "[m]ental status examinations did not reveal distractible thought process or response to internal stimuli," Claimant "alleged difficulty completing tasks but only in relation to his physical impairments," and that "a consultative examination document[ed] that his mental health has not historically impacted his occupational functioning." (R. 14, 18). Accordingly, the ALJ formulated a RFC that limited Claimant "to only simple work instructions with reduced social interactions to account for the anxiety and limitations in mental function from his reports of pain and side effects from medication" and she found that no "[g]reater limits were … supported by the medical evidence." (R. 18). In making these findings, however, the ALJ ignored evidence from treating physician Demorest's findings that Claimant "wander[s] off topic," "[g]ets off track easily," and is "tangential." (R. 411, 417, 418). The ALJ also failed to address Dr. Demorest's opinion that Claimant would be "off-task" (i.e., unable to perform work) more than 30 percent of the workday. (R. 468).

The ALJ "may not select and discuss only that evidence that favors [her] ultimate conclusion, . . . but must confront the evidence that does not support [her] conclusion and explain why it was rejected." *Stephens,* 888 F.3d at 329 (citations and internal quotation marks omitted);

---

[4] Claimant's complaint regarding his difficulty with sitting and his very modest lifting abilities were also referenced repeatedly in the July 2016 Disability Determination Explanation that the ALJ relied upon in her decision. (R. 18, 109, 112, 115).

15

*Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004). The ALJ was therefore required to address Dr. Demorest's findings on these points because they conflicted with her findings and would have supported a finding of disability. *See* (R. 84 (testimony from the VE that there would be no competitive work available if Claimant were off-track for more than 15 percent of the workday)). The ALJ's failure to address this evidence requires remand. *Scrogham,* 765 F.3d at 698-99; *O'Connor–Spinner v. Colvin*, 832 F.3d 690, 697–98 (7th Cir. 2016) (citing cases).

### 3. The ALJ Erred By Drawing Negative Inferences From The Fact That Claimant Did Not Obtain Specialized Treatment Without Considering The Reasons Claimant Failed To Do So

In discounting Dr. Demorest's opinion, the ALJ inferred that his restrictions were too extreme, in part, because "[C]laimant never received regular treatment from an orthopedist or pain management specialist." (R. 18). The ALJ also referenced Claimant's "history of conservative treatment" as a factor cutting against the existence of an impairment that would preclude him from performing work at least at the light exertional level. (R. 17). The ALJ made these negative inferences without addressing the testimony by Claimant and statements by his counsel that Claimant has not been able to afford such specialized treatment due to his loss of insurance and lack of finances. (R. 41, 59, 68-71).

It is well-settled that "an ALJ 'must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide.'" *Roddy v.Astrue,* 705 F.3d 631, 638 (7th Cir. 2013), *quoting* SSR 96-7P, 1996 WL 374186, at *7 (Jul. 2, 1996); *Craft,* 539 F.3d at 679 (an ALJ should not draw negative inferences from a claimant's failure to seek treatment "unless the ALJ has explored the claimant's explanations as to the lack of medical care" and found that the claimant did not have a good reason). As the Seventh Circuit has

16

recognized, "the agency has expressly endorsed the inability to pay as an explanation excusing a claimant's failure to seek treatment." *Roddy,* 705 F.3d at 638; *Glenn H. v. Saul,* No. 18 C 6008, 2019 WL 6112684, at *6 (N.D.Ill. Nov. 18, 2019). This is quite sensible. If a person cannot afford medical treatment, they cannot obtain the treatment even if they desperately need it. Consequently, their failure to obtain the treatment in this situation does not mean that they did not need the treatment. On remand, the ALJ is directed to consider Claimant's reason for not seeking specialized treatment before drawing negative inferences from his failure to do so.

### 4. The ALJ Erred By Relying On Outdated Medical Assessments That Did Not Consider The Impact Of Claimant's More Recent Injuries

The ALJ formulated her RFC assessment by giving "[s]ome weight" to a "July 2016 Disability Determination Explanation" concerning Claimant. (R. 18). The ALJ also appears to have relied on Dr. Aliaga's report from his December 8, 2015 examination of Claimant. The ALJ referenced Dr. Aliaga's report – which found that Claimant's grip strength in both hands was 5 out of 5 and that Claimant had no difficulties with his upper extremities (R. 369, 371) – to discredit Dr. Demorest's finding that Claimant would have limited use of his hands during the workday. (R. 18). It is undisputed that the July 2016 Disability Determination and Dr. Aliaga's December 2015 examination and report were prepared *prior* to Claimant's most recent three falls which resulted in fractures to both his left and right wrists and caused pain to his hands and left shoulder. (R. 404-07, 418-21, 428-29).

It is well settled that "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill,* 882 F.3d 722, 728 (7th Cir. 2018); *Lambert v. Berryhill,* 896 F.3d 768, 776 (7th Cir. 2018); *see Mary P. v. Berryhill*, No. 17-CV-06545, 2019 WL 2491640, at *7–8 (N.D. Ill. June 14, 2019) (instructing the ALJ to "submit all the medical

evidence to the state agency physicians for further review and scrutiny before making a determination that relies on their opinions"). In this case, it is possible that consideration of the fact that Dr. Aliaga and the July 2016 Determination did not factor in Claimant's more recent injuries could change the ALJ's decision to rely on them rather than Dr. Demorest (who issued his opinion in December 2017).[5] The ALJ is directed to explore this issue on remand.

## CONCLUSION

For the reasons stated above, Claimant's motion for summary judgment [13] is granted. The Commissioner's cross-motion for summary judgment [20] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings. On remand, the ALJ shall (1) determine if Dr. Demorest's opinion should be granted controlling weight, if not, she shall discuss the regulatory factors in assigning lesser weight; and (2) reassess Claimant's RFC assessment with consideration of all relevant medical evidence and Claimant's reason for not obtaining the specialized treatment that had been recommended for him.

ENTER:

_____
**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated: May 15, 2020**

---

[5] As Claimant has pointed out, the ALJ's decision to rely on the July 2016 Determination is puzzling in any event because this Determination (which found that Claimant has *no* severe impairments) directly contradicts the ALJ's finding that Claimant has *four* severe impairments. (R. 13, 18).